## Newson's Adm'r. *vs.* Douglass.
## Douglass vs. Newson's Adm'r.—June, 1826.

In an action of *assumpsit* by C, claiming to be the owner of the property insured, against *D,* to recover the amount received by D, upon certain policies of insurance effected in his name, *for account of whom they might concern.*—*Held,* that it was competent for D to show that the policies were effected by him as the agent of a third person, and that the letters of that person to D, directing the insurances, were admissible evidence of that fact.

The words, "whom it may concern," in a policy of insurance, are technical, and are understood to mean not any and every body who may chance to have an interest in the thing insured, but such person only as is in the the contemplation of the contract. They suppose an agency, and look solely to the principal in whose behalf, or on whose account the agent acts. Such principal is the person in the contemplation of the contract, and is the one whom it alone concerns; and his existence may be proved by extrinsic evidence.

No person can avail himself of a policy of insurance, not containing the general clause "whom it may concern," or one of similar import, but those named in the policy as the parties insured, or on whose account it is expressed to be made.    But a policy in the name of one, with this general clause, will cover the interest of any person for whose benefit it is intended when effected, and who either previously authorises it, or subsequently adopts it—subsequent adoption in such a case being equiva- lent to a prior order for the insurance.

Where A authorises B to effect an insurance for him—or B, without authori- ty, designs to insure for A, and in either case B directs a sole agent to insure in such sub-agent's name, with the general clause, the policy will enure to A's benefit, although his interest was not known to the sub- agent, or to the underwriters, in like manner as it would have done had it been immediately effected by B himself.

The plaintiff C, claiming title to the property insured under a bill of sale to him from the principal of the defendant D—*Held,* that it was not com- petent for D to show that such bill of sale was intended by his principal to defraud his creditors, however unfair C's conduct may have been in relation to it.

The sworn certificate of the captain of a vessel, insured by an agent, of the disbursements of the agent upon the vessel, is not evidence of such dis- bursements, in an action, against the agent by the principal, to recover the amount received by the agent upon the insurance; but the captain himself should be produced.

Interest is recoverable as of right upon contracts in writing to pay money upon a day certain, as upon bills of exchange or promissory notes, or on contracts for the payment of interest, or where the money claimed has been actually used, and upon bonds, &c. but in other cases it is a ques- tion entirely for the jury, to be decided according to the equity and justice between the parties, on a consideration of all the circumstances of the particular case as disclosed at the trial.

After the opinion of the court was delivered, and before judgment was en- tered, the appellant was permitted to dismiss his appeal.

CROSS APPEALS from *Baltimore* County Court.    This was an action of *assumpsit* for money paid, laid out and expended; for money had and received, and for money lent and advanced. The defendant *(Douglass,)* pleaded *non assumpsit,* and is- sue was joined.

1. At the trial the plaintiff, *(Newson's* administrator,) of- fered in evidence, that his intestate was the owner of the ship *Mohawk* at the time of his death; and that while such owner- ship continued in the representatives of the intestate, the de- fendant sent to the offices of *The Baltimore Insurance Com- pany,* and *The Patapsco Insurance Company,* the following

orders for insurance. "*George Douglass* wants insurance for account of whom it may concern, on ship *Mohawk* and cargo, *James T. Harding* master, at and from hence to *Port-au-Prince*, against all risk. Say on vessel, valued thereat, $6000; on cargo $20,000. The *Mohawk* sails under a certificate of *American* ownership—is well fitted and found, and the captain a good officer. She will probably sail to day. In case of loss the amount to be paid to me. What premium, secured by *R. H.* and *W. Douglass?* That the said offices upon this order entered into the policies of insurance, which he also offered in evidence. That by *The Baltimore Insurance Company* was executed on the 26th of August 1817, whereby the said company insured "*George Douglass*, for account of whom it may concern, as well in his own name, as for and in the name and names of all and every other person or persons to whom the same doth or shall appertain, in whole or in part, and every of them," &c at and from *Baltimore* to *Port-au-Prince*, upon the *cargo* of the ship *Mohawk*, to the amount of $18,000 at a premium of $2\frac{1}{2}$ *per cent.* Another policy by the same company was executed on the same day, and in like manner and form as above mentioned, on the ship *Mohawk*, to the amount of $2,000 at a like premium. And the other policy by *The Patapsco Insurance Company* was executed on the same day, and in like form and manner, as above mentioned, on the ship *Mohawk*, to the amount of 4,000 at the like premium. The plaintiff further proved, that while said policies were in force, the said ship was lost by one of the dangers insured against, and that on said loss the said insurance companies on the 31st of December 1817, and 7th of March 1818, paid to the defendant, on account of said policies, the sum of $5,595 38. The defendant then, for the purpose of proving, that in effecting said policies of insurance the defendant acted as the agent and on account of one *Archibald Kane*, who it was admitted was dead, offered to read in evidence the following letters from said *Kane* to the defendant, viz. One dated at *Port-au-Prince* the 28th of June, 1817. "The sole object of this letter is to request you will make insurance for me to the amount of *twenty thousand dollars*, as follows: *ten thousand dollars* on coffee, valuing the same at *fifteen dollars* pr. cwt.

on Logwood *three thousand dollars*, valuing the same at *twenty-five dollars* per ton; and on the hull of the ship *Mohawk, seven thousand dollars*, on board the ship *Mohawk, Harding, master*, at and from *Port-au-Prince* to *Baltimore.* The *Mohawk* will sail in ten days." Another dated at *Port-au-Prince*, the 28th of June 1817. "The enclosed letter for insurance let it have your earliest attention. The ship *Mohawk* was formerly the *La Franchise*, under the *Haytian* flag, but during her last voyage to *New-York*, she obtained papers enabling her to sail under the *American* flag, though she did not get them early enough to clear out from *New-York* for this place. She is a fine ship, almost new, and coppered to high ballast mark. She was built at *New Bedford*, and is six years old. My object, on her arrival at *Baltimore*, is to sell or exchange her for a good schooner of about 800 bls; say, that will stow about 130 *a* 150 wt. coffee in bags, to be kept as a regular trader on my own account between this and *Baltimore*. I do not care much about her being coppered, as she never should lay here long enough to be injured by worms. The ship is too large for my purpose, and her foreign duties and charges makes it ruinous. Is it not possible for you to make the exchange for me, on almost any terms, with some of your ship-builders? The *Mohawk* would do well to load for *Cadiz*, and there sell her. She is well found in every thing. Will you, my dear sir, sound, and see if any arrangement can be made on her arrival? She has cost me, first and last, $20,000, and I declare I should be willing to exchange her for a schooner value $5000. I shall write you fully by her, in the meanwhile you could make inquiries, &c. I shall do a great deal of business with you hereafter. Since the unfortunate failure of my northern friends, I shall do every thing with you? *and I beg particularly that all our affairs may be kept snug from every one.* I have lost several fortunes in supporting my friends, and I must now devote my time and attention to my own interest. With you, you will always find me punctual and correct, and with your good attention to my interest in *Baltimore*, I flatter myself I shall soon *look up.* I write my friend by this conveyance that I shall merely send the *Mohawk* to you with wood, to return

with lumber. I beg you will keep me regularly informed of your market for *German* goods. You know the kind fit for this market. Provisions and Yankee cargoes of fish are tumbling in from the N and Eastern states, and markets falling. I hope the *Mohawk* will sail in all next week." Another letter, dated at *Port-au-Prince*, the 5th of July, 1817. "Inclosed you have invoice and bill lading of coffee and logwood, shipped on board the *Mohawk, Harding*, master, amounting in *our currency* to $21,810 72, which you will dispose of when you think proper. I have determined the *Mohawk* shall return, having engaged with President *Pelion* to furnish him with a quantity of pitch pine timber and boards, as per his letter herewith, and to which I ask your best attention. Capt. *Harding* is the stepson of my deceased friend Capt. *Newson*, who died here last month, and to him I shall continue the command of the ship. He will engage a friend of his as mate at *New-York*. On the arrival of the ship at *Baltimore* you will discharge the crew, the amount due them, if they arrive *in all this month*, will be a little under one thousand dollars, as per statement herewith. I wish you to take complete charge of the vessel in unloading and loading her, as Capt. *Harding* must go on to *New-York* to regulate some affairs, and will return to *Baltimore* in about ten days. I am well aware of your zeal, attention and economy, and I trust the *Mohawk*, will not be over twenty days in port. On her return she will have 10 sailors and an officer, and I wish you to put in provisions for the crew for only 60 days, and small stores for the cabin, say to amount of 60 or $70. Capt. *Harding* is in my full confidence, and will inform you his object in going on to *New-York*. The vessel wants nothing to make her voyage back here, excepting a few days caulking. On her arrival here I can put her in order, having the government store and arsenal rather in my favour. I leave every thing to your good management. When the 100 feet timber and boards are in, and the articles contained in my note, should she not be full, fill her up with white pine boards. I shall confidently look for her in this port in 60 days from this date. The return cargo to be insured out to *Port-au-Prince*; the vessel also to be estimated at *six thousand dollars*." Then follow the invoice signed by *Harding*, and the letter of pre-

sident *Petion*, both dated the 4th of July 1817.    Another let-
ter, dated at *Port-au-Prince* the 9th of July 1817.    "Inclosed
you have duplicate for insurance on the *Mohawk* and cargo,
which vessel sailed on Saturday evening the 5th inst. (this is
Monday,) to which I beg your attention.    I also inclose du-
plicate invoice and bill lading of her cargo.    I have nothing
further to add, only a *full confirmation* of my respects by her.
Hoping soon to hear from you, and that you will keep *all my
affairs snug between us.*"    "Note for return cargo, ship *Mo-
hawk, Harding*, master, to be shipped by Mr. *George Doug-
lass* on my account and risk, under full insurance, to *Port-au-
Prince*, 1000 barrels," &c.    Another letter, dated at *Port-au-
Prince* the 9th of July, 1817.    "Your highly esteemed favour
of 21st of June was handed me this morning by Mr. *Crocket*.
Since my respects pr. *Mohawk* many herrings and soap have
arrived, and as the herrings were intended for gover't. they do.
not now want them; or in other words, I think I can do better
than to furnish them.    In the event of my order per *Mohawk*
not having been acted upon, the enclosed note for her return
cargo you will please allow to take its place.    The *India* goods
and hkfs.    I shall leave entirely to your good judgment, as
you well know what this market is.    I have merely stated the
kind that are now in demand, and as no arrivals from *England*
can be expected till Novr. or Decr. I calculate this will do
well.    The lumber for the president, as well as his tables, as
stated in his letter enclosed to you pr. *Mohawk*, will have, I am
sure, your best attention.    If I had funds in your hands I would
add considerably to the *India* goods.    You may rest assured,
my dear sir, should my funds not amount to my order, which
I suspect they will not by several thousand dollars, you shall be
in full remittances *within* 90 *days* from their sailing from your
port.    I do not expect that you will be willing to advance more,
especially after the fate of my northern friends, but I can only say,
*A. Kane is unexceptionable for all his engagements*.    We
have nothing new from *France* respecting this Island.    This
letter goes by the governor *Selby* for *New York*, which I hope
may be in time  to stop the herrings and soap."    To the read-
ing of these letters the plaintiff objected; but the Court, [*Arch-
er*, Ch. J. and *Hanson*, and *Ward*, A. J.] overruled the ob-

jection, and permitted them to go to the jury. The plaintiff excepted.

2. The defendant then offered to read in evidence the following certificate, given by *James T. Harding*, for the purpose of showing the amount of disbursements paid by the defendant on account of the ship *Mohawk*, in order to have said disbursements deducted from the claim of the plaintiff, viz. "I *James T. Harding*, late master of the ship *Mohawk*, do hereby certify, that Mr. *George Douglass'* bill of disbursements against the ship *Mohawk*, when she left *Baltimore* in August 1817, amounted to twenty-eight hundred and ten dollars and sixty-seven cents, and that the same was just and correct. *New-York*, 9th October, 1824, *James T. Harding.*"

State of *New-York*. City of *New-York*, Sct. *James T. Harding* of the said city, being duly sworn, doth depose and say, that the matters of fact set forth in the above certificate, to which he hath subscribed his name, is in all respects just and true; and further says not. *James T. Harding.*

Sworn to this 18th of October 1824, before me,

*John Hildreth*, Commr.

To the reading of which paper the plaintiff objected, there being no proof that *Harding* was dead; but the court overruled the objection, and permitted the paper to be read in evidence to the jury. The plaintiff excepted.

3. The plaintiff then prayed the court's opinion and instruction to the jury, that if they believed the plaintiff entitled to recover the amount received by the defendant on the policies stated in the preceding bills of exceptions, deducting the disbursements paid by the defendant on account of the ship insured by said policies, that then the plaintiff was also entitled to be allowed legal interest on said amount. Which prayer the Court, [*Archer*, Ch J. and *Ward*, A. J.] refused to give, being of opinion, and so instructing the jury, that whether interest should be allowed or not, was a question to be decided by them, and not by the court. The plaintiff excepted.

4. The plaintiff, in order to support the issue on his part, gave evidence, that the defendant handed into the *Baltimore*

*Insurance Company*, and *Patapsco Insurance Company*, two incorporated companies in the city of *Baltimore*, the orders of insurance stated in the plaintiff's first bill of exceptions, wh ch were respectively accepted, and that the policies, also set forth in the first bill of exceptions of the plaintiff, were executed in due form by the said companies respectively. And further gave in evidence, that the said ship *Mohawk*, mentioned in the said policies of insurance, was the property of *Samuel Newson*, the plaintiff's intestate; and that the said ship departed and set sail from the port of *Baltimore*, on the voyage insured, on the —— day of September, in the year 1817, and in the prosecution of that voyage was wholly lost by the perils of the sea. He further gave in evidence, that the defendant applied to the said insurance companies, and received from them the amounts respectively insured by the policies aforesaid, after deducting therefrom the usual charges. And further read in evidence the depositions, returned under the commission issued in this cause to take testimony, and the following *exhibit No.* 1. "Know all men by these presents, that I *Archibald Kane*, of the state of *New-York*, a native born citizen of the *United States*, (but at present in the city of *Port-au-Prince*, island of *Saint Domingo*) for and in consideration of the sum of five thousand dollars to me in hand paid, at and before the sealing and delivery of these presents, by *Samuel Newson*, ship master of the city of *New-York*, have granted, bargained and sold, and by these presents do grant, bargain and sell, unto the said *Samuel Newson*, his executors, administrators and assigns, the whole of the good ship or vessel called *The La Franchise*, of the burthen of three hundred and sixty tons, or thereabouts, together with all her masts, sails, yards, anchors, cables, ropes, cords, boats, oars and furniture, to the said ship belonging or in anywise appertaining. To have and to hold the said ship or vessel unto him the said *Samuel Newson*, his executors, administrators and assigns forever, as his and their own proper goods, and to and for his and their own proper use and uses forever. And the said *Archibald Kane* doth hereby for himself, his heirs, executors and administrators, covenant, promise, grant and agree, to and with the said *Samuel Newson*, his executors, administrators and assigns, that the said *Archibald*

*Kane*, at the time of the sealing and delivery of these presents, is the true and lawful owner of the said ship or vessel, and premises, hereby granted, bargained and sold, or mentioned, or intended so to be, unto the said *Samuel Newson*, his executors, administrators and assigns, as aforesaid; and that he the said *Archibald Kane*, at the time of the sealing and delivery hereof, hath in himself full power and good authority in law to grant, bargain and sell, the said ship or vessel, and premises above bargained and sold, or mentioned, or intended so to be, unto the said *Samuel Newson*, his executors, administrators and assigns, in manner aforesaid; and also that it shall and may be lawful to and for the said *Samuel Newson*, his executors, administrators and assigns, from time to time, and at all times hereafter, quietly and peaceably to have, hold, possess and enjoy, the said ship or vessel, and all other the premises hereby granted or mentioned, or intended so to be, without the let, trouble, denial, molestation, hindrance or disturbance, whatsoever, of him the said *Archibald Kane*, his executors, administrators or assigns, or of any other person or persons whatsoever, lawfully claiming, or to claim by, from, or under him, them, or any of them, and that freed and discharged of and from all former and other bargains, sales and incumbrances, made, done or committed, by him the said *Archibald Kane*, or any other person or persons by his order, consent, privity or procurement. In witness whereof I have hereunto set my hand and seal this twenty-fourth day of September, in the year of our Lord one thousand eight hundred and sixteen.

*Archd. Kane*, (Seal.)

Sealed and delivered in presence of,

    *H. Wainwright, James T. Harding."*

"*James T. Harding*, of the city of *New-York*, deposeth and saith as follows: To the first interrogatory this deponent saith that he knows the parties, plaintiff and defendant. That he knew the plaintiff ten or twelve years since slightly, and that he knew the defendant in the year 1817, since which time he has had but little knowledge of him. To the second interrogatory this deponent saith, that he knew both *Archibald Kane* and *Samuel Newson;* that the said *Samuel Newson* was the step-father of the witness. That he first knew *Archibald*

*Kane* about twelve years since, and was acquainted with him up to about July 1817, and that he has known *Samuel Newson* since he the witness was a child. That they are both dead. *Kane* died at *Port-au-Prince* in September 1817, and *Newson* died at *Port-au-Prince* in June in the same year. To the third interrogatory this deponent saith, that he knows the handwriting of *Archibald Kane*, has seen him write, and has received letters from him. The witness having looked upon the paper, marked *exhibit No.* 1, saith that the signature to the said paper, "*Archd. Kane,*" is in the proper handwriting of the said *Archibald Kane.* To the fourth interrogatory this deponent saith, that at the time of the date of the said paper marked exhibit No. 1, the said *Archibald Kane* resided at *Port-au-Prince,* and the said *Samuel Newson* was a ship master, sailing out of the port of *New-York;* that he does not know whether *Newson* was at *Port-au-Prince* at the time the said paper bears date, or not. That *Archibald Kane* had resided at *Port-au-Prince* several years previous to 1817, cannot say how many, and that *Newson* never regularly resided at *Port-au-Prince* but traded backwards and forwards between that place and *New-York.* That both *Archibald Kane* and *Samuel Newson* were, as deponent believes, citizens of the *United States* at the time the said paper bears date; he knows nothing to the contrary; that the said *Archibald Kane* and *Samuel Newson,* or either of them, were not connected with any commercial house in the *United States* to this deponent's knowledge. To the fifth interrogatory this deponent saith, that the signature of *James T. Harding,* to the paper marked exhibit No. 1, is the true signature of the witness; that he is acquainted with the handwriting of *H. Wainwright,* has seen him write, has not corresponded with him, but has received notes and bills from him. To the sixth interrogatory this deponent, having looked upon the said paper marked exhibit No. 1, saith that the signatures to the said paper are in the proper handwriting of him the said witness, and of *H. Wainwright* the other subscribing witness. To the seventh interrogatory the deponent saith, that he is one of the attesting witnesses to the said paper marked No. 1, and did subscribe his name thereto as such, and did see the other subscribing witness sign

the same, and that he did see the said *Archibald Kane* sign, seal, and deliver the said paper 'writing as his act and deed, in the latter end of January, ' or beginning of February 1817, at the house of the said *Archibald Kane* in *Port-au-Prince.* To the eighth interrogatory this deponent saith, that to the best of his knowledge and belief the said ship, named and described in the said paper marked exhibit No. 1, belonged, in the months of August and September 1817, and up to the time of her loss, to the said *Samuel Newson*, or rather to his representatives. That at the time the said paper bears date, the name of the said ship was *La Franchise;* that the name of the said ship was changed at *New-York* in the latter end of December 1816, to *Mohawk*, by the said *Samuel Newson*, as the witness presumes; all he knows is, that the name *Mohawk* was painted on her stern. Witness does not know the reason of changing her name, the said ship had previously sailed under *Haytien* colours. The witness sailed from *Baltimore* on board the said ship in August 1817, for *Port-au-Prince*, and the said ship was wrecked and totally lost on *Crooked Island* on the tenth day of September in that year. The witness says, that the defendant told him the said ship was insured for the said last mentioned voyage for six thousand dollars; that the said ship cleared out by the name of *Mohawk* on her last voyage. To the ninth interrogatory the deponent saith, that the said ship was cleared out on her last voyage from the *United States* by the defendant. That on the death of the said *Samuel Newson*, who was captain of the said ship, this deponent, being the first officer, took command of the said ship with the assent of the said *Archibald Kane*, for the purpose of making a voyage from *Port-au-Prince* to *Baltimore*, and back. This deponent arrived at *Baltimore* in said ship, as master, and sailed again on her last voyage for *Port-au-Prince*, without any new appointment as such master. The witness shipped the seamen for the said last voyage under the direction of a notary. To the cross interrogatories the witness says, that being sworn on the Holy Evangelists of Almighty God, he is willing, truly and faithfully, to answer the interrogatories put by the defendant To the first cross interrogatory the deponent saith, that the said ship did not make any

voyage from *Port-au-Prince* to *New-York* in the year 1817; but the said ship did make a voyage from *Port-au-Prince* to *New-York* in 1816, at which time witness was mate or first officer of said ship, under the said *Samuel Newson* as captain. The witness does not know to whom the said ship belonged at that time. She was sometimes called the President's ship, (meaning *Petion's* ship,) and sometimes Mr. *Kane's* ship; he presumes she was Mr. *Kane's* ship. To the second cross interrogatory the deponent saith, that the said ship was loaded at *Port-au-Prince* in the year 1816, by the said *Archibald Kane*, and consigned to *John Kane* of *New-York*, brother to the said *Archibald Kane*; that no freight was ever paid or demanded on the goods of *A. Kane*, to the knowledge of the witness. To the third cross interrogatory the deponent saith, *Archibald Kane* and *Samuel Newson* were concerned together for several years, and that the said *Samuel Newson* sailed in the employ of the said *Archibald Kane* about a year previous to the year 1817; that he presumes that the said *Samuel Newson* enjoyed the confidence of the said *Archibald Kane* during that time. To the fourth cross interrogatory the deponent saith, that he understood and believed that the said ship belonged to *Archibald Kane* during the time she was called *La Franchise*, but the witness believes she belonged to *Samuel Newson* after she was called the *Mohawk*. The witness considers that *Samuel Newson* was in the employ of *Archibald Kane*, while the said ship was under *Haytien* colours, but cannot say whether *Newson* was in the employ of *Kane* after the name of the said ship was changed to *Mohawk*; he has no belief on the subject. The witness says, that the said ship *La Franchise* did enter, unload and load, in *New-York*, in 1816, and that captain *Newson* did obtain a certificate of *American* ownership of the said vessel, and called her the *Mohawk*. To the fifth cross interrogatory the deponent saith, that he continued in the same capacity, as first officer of the said ship, until her arrival at *Port-au-Prince*, and up to the time of captain *Newson's* death; that the said ship arrived at *Port-au-Prince* on the 18th day of January 1817, and captain *Newson* died on the 5th of June following. Witness says he has heard captain *Newson* say that the *Mohawk* belonged to him, but never heard him say any thing on

the subject of the payment of the consideration—he believes
captain *Newson* was able to . buy such a ship.    Witness knows
nothing about *A. Kane's* being the rightful owner of said ship,
or of her being covered by captain *Newson* for *A. Kane,* and
had no means of ascertaining what the general opinion was at
*Port-au-Prince,* as he had but little intercourse with the shore.
She was generally called *The President's Ship,* both before
and after her name was changed to *Mohawk.*    The witness ne-
ver heard captain *Newson,* in speaking of said ship *Mohawk,*
speak of her as Mr. *Kane's* ship; but he did hear captain *New-*
*son* say, that if he could settle his affairs with the said *Archi-*
*bald Kane,* he would return home with the said ship, and that
he believed *Archibald Kane* was playing the fool with him,
and would not furnish him a cargo.    Witness never heard
,*Archibald Kane* speak of the *Mohawk* as his ship; but after
the death of captain *Newson,* the said vessel being then loading
for *New-York, Kane* said he was acquainted with captain *New-*
*son's* affairs, and changed the destination of the ship to *Balti-*
*more,* where he said he would furnish a cargo for *Port-au-*
*Prince,* and thence send her to *Europe* where she could be
sold.    The witness says, that *Archibald Kane* instructed him
to go on to *New-York* to obtain authority from the administra-
tors of *Samuel Newson* to dispose of the said ship; and that
after the arrival of the said ship at *Baltimore,* he the witness
did go on to *New-York* for that purpose, but learnt that no ad-
ministrators had been appointed.    Witness says that captain
*Newson* did draw the money, to pay the crew of the said ship
*Mohawk,* from *Archibald Kane,* and that he the witness also
did the same after his appointment to the command of the said
ship; as to his appointment to the command of the said ship,
the witness refers to what he has already said on that subject
in his direct examination.    That at the time witness took the
command of the said ship, he had no particular conversation with
the said *Archibald Kane,* but that *Kane* promised to allow
witness sixty dollars per month wages.    The witness says that
*Kane* loaded the said ship *Mohawk* with logwood and coffee,
consigned to *G. Douglass* of *Baltimore,* the freight of which
was, as witness believes, stated per bill of lading to have been
paid at *Port-au-Prince.*    That said *Kane* did not pay, or pro-

mise to pay, any freight to witness, but said that when the vessel returned he would close up and settle captain *Newson's* accounts. That he the witness did sign the bills of lading without asking any questions concerning freight; Mr. *Kane* saying the bill of lading was filled up as previously mentioned to satisfy Mr. *Douglass*. The witness says that Mr. *Kane* did not mention to him in confidence any thing relating to his business, or his creditors in *New-York*, or to the situation of his property. That the said *Archibald Kane* did not charge witness to go on to *New-York*, immediately after his arrival at *Baltimore*, for the purpose of preventing his creditors from attaching or molesting the ship or cargo at *Baltimore;* that witness did go from *Baltimore* to *New-York*, but for the purpose previously mentioned. The witness says he has no recollection of a portage bill having been sent to *G. Douglass* by *A.* Kane; but he does recollect, that on his arrival at *Baltimore*, he made out a portage bill, in which, as he believes, the wages of captain *Newson* were not inserted, his own wages as mate and captain, and the wages of the crew, were included in the said portage bill. Witness recollects that *A.* Kane did say he would give orders to *G. Douglass* to pay the portage bill at *Baltimore*, but does not recollect that he said any thing further on this subject to the witness or the crew. He believes he did ask Mr. *Douglass* for the amount of the portage bill shortly after deponent's arrival at *Baltimore*. The witness has no recollection of having stated to Mr. *Douglass* that *A.* Kane had made a mistake in calculating the wages of captain *Newson*, nor has he any recollection of the amount received of Mr. *Douglass* to pay off the crew. Witness says that he had no bargain or agreement with *A.* Kane on the subject of cabin stores. That he recollects to have had some altercation with Mr. *Douglass* as to the amount, and recollects to have paid a part of it himself to Mr. *Chappell*, but he has no particular recollection of the amount thus paid by him. Witness says he has no recollection of mentioning to Mr. *Douglass* that Mr. Kane had become d—n stingy and close in sailing his vessels. The witness had no understanding with Mr. Kane about the privilege of an adventure in the *Mohawk* free of freight, nor does he recollect any conversation with Mr. *Douglass* on that subject. Witness says that af-

ter the said vessel was loaded at *Baltimore* by *G. Douglass,* and consigned to *A. Kane,* he the witness did sign bills of lading, in which the freight was stated as having been paid at *Baltimore,* the witness considering that all the accounts would be arranged by Mr. Kane at *Port-au-Prince;* that neither Mr. *Douglass,* nor any one else, paid the witness the freight, or any part of it; that the witness signed the bills of lading without asking any questions, for the reasons previously given. Witness says, that at the time of witnessing the said paper marked exhibit No. 1, the parties thereto were present; that neither of the parties stated to the witness the purport of that paper, and that he did not at that time, nor at any other time, witness any other paper of the same kind or appearance. The witness does not know that he ever did witness a counter bill of sale of the said ship *La Franchise,* or *Mohawk,* from *Samuel Newson* to *Archibald Kane.* Witness never understood from *Archibald Kane* whether he had or had not made a *bona fide* sale of the said ship *La Franchise,* or *Mohawk,* to *Samuel Newson.*" Whereupon the defendant, in support of the issue on his part, offered in evidence the letters stated in the plaintiff's first exception, written by *Archibald Kane* to the defendant, respectively bearing date the 28th of June and 5th of July 1817, to show, that in making the said policies of insurance he was acting as the agent of the said *Archibald Kane.* And further offered in evidence the depositions returned under the commission in this cause. The defendant then moved the court to instruct the jury, that if they shall be of opinion that the bill of sale offered in evidence by the plaintiff, as proved under the commission aforesaid, was a merely fictitious instrument, without any consideration really paid therefor, that the sale was merely colourable, and intended to cover the interest of *A. Kane* in the *Mohawk,* under the name of *Samuel Newson,* and that notwithstanding such pretended sale the property of the vessel in the understanding, both of *Newson* and Kane, remained in the said Kane at the time of the insurance effected by the defendant, and at the time of the loss of the vessel, that then the plaintiff is not entitled to recover in this action. And the defendant further moved the court to instruct the jury, that if the jury shall be of opinion, that the bill of sale aforesaid from

*A. Kane* to *Samuel Newson,* is a genuine instrument, and that the sale of the vessel by *Kane* to *Newson,* was a valid and *bona fide* sale, yet if they shall also be of the opinion that the insurance effected by the defendant with the aforesaid insurance companies, as set forth in the evidence, were effected by the defendant, as the agent and for the benefit of the said *Kane* alone, and that neither the said *Newson,* nor his representatives, nor any interest of their's, real or supposed, was within the contemplation either of the defendant, the agent, or of the said insurance companies, at the time the said insurances were effected, nor was intended by them, or either of them, to be covered by the said policy, that then the plaintiff is not entitled to recover in this action. Both of which instructions the Court [*Archer* Ch. J. and *Ward,* A. J.] refused to give; but were of opinion, and so instructed the jury, that if they should believe that the said bill of sale was executed by the said *Archibald Kane,* that then the same was good and legal evidence of title in the said *Samuel Newson,* and his representatives, and that no testimony was admissible to prove that said bill of sale was collusive and fictitious, and intended to defraud the creditors of the said *Archibald Kane.* The defendant excepted. Verdict for the plaintiff, and damages assessed to $2,784 71. Judgment on the verdict for $10,000 current money, the damages laid in the declaration, and costs; to be released on payment of the damages assessed by the jury, with interest, &c.

The plaintiff and defendant both appealed to this court, where both appeals were argued together before BUCHANAN, Ch. J. and EARLE and STEPHEN, J.

*Kennedy,* for *Newson's* Adm'r. on the appeal by him. He contended, 1. That the court below erred in admitting in evidence the letters from Kane to the defendant, in the manner stated in the *first* bill of exceptions, for the purpose of showing, that the policies of insurance were intended for the benefit of Kane, and that the defendant acted for Kane alone, in effecting them, and not for *Newson*—because the same was contradictory to the terms of the policies, and the bill of sale from Kane to Newson.

2. That the court below also erred in admitting the certifi-

cate of *James T. Harding,* master of the ship *Mohawk,* in her last voyage, as competent evidence of the amount of disbursements made on account of said ship by the defendant, because *Harding* was alive, and was examined as a witness in the cause, and the said certificate was given by him after the commission which issued to take testimony was closed—and there was no privity between him and the plaintiff.

3. That the court below further erred in allowing such disbursements, so proved, to be deducted by the jury from the amount of money received by the defendant from the insurance offices, on account of the said ship, and to which the plaintiff was entitled, because the defendant, by law, ought not to have been allowed for such disbursements, even if the same had been duly proved.

4. The court below erred in leaving to the jury the question of the plaintiff's right to recover interest, as a question of fact; and ought to have instructed them that the plaintiff was entitled to interest from the commencement of the action.

5. The court below erred in not directing the jury, if they found the execution of the bill of sale, to give a verdict for the plaintiff for the whole amount they should find the defendant received on account of the ship *Mohawk,* together with interest as aforesaid, deducting only the amount of the premium notes of the defendant; and that this court ought now to render the *judgment* which the court below should have given, it being mere matter of computation from the facts found by the jury, and admitted upon the record; and that there would therefore be no occasion for a *venire de novo.*

1. The insurance of the vessel at the two offices, which is the only question in controversy, must enure to the benefit of *Newson's* representatives; and the letters of *Kane* were inadmissible in evidence while the ownership of the vessel was in *Newson's* representatives. It was not competent for the defendant to deny such ownership. He acted as the agent for *Newson's* representatives; and the insurance was made *for whom it might concern.* No parol evidence was admissible to show that any other person was interested but *Newson's* representatives; and it was only necessary to show that the vessel belonged to *Newson's* representatives. He cited 2 *Phill. Evid.* 45

*Mumford vs. Hallett,* 1 *Johns. Rep.* 439. *Graves vs. Boston Marine Insurance Company,* 2 *Cranch,* 419. *Lyman vs. United Insurance Company, &c.* 17 *Johns. Rep.* 337. *Jackson vs. Foster,* 12 *Johns. Rep.* 488. The making the insurance made the defendant an agent for *Newson's* representatives. He had the possession of the vessel, and was the agent of the person to whom she belonged; and the attempt to use in evidence *Kane's* letters, was an attempt to defeat the right owner out of the insurance. *Lucena vs. Crauford,* 3 *Bos. & Pull.* 75, 93   *Routh vs. Thompson,* 13 *East,* 274. *Lanyon vs. Blanchard,* 2 *Campb.* 597. *Hagedorn vs. Oliverson,* 2 *Maule & Selw.* 485. *Tenant vs. Elliott,* 1 *Bos. & Pull.* 3.

2. On the *second* and *third* points, he cited *French vs. Backhouse,* 5 *Burr.* 2727. *Wolff vs. Horncastle,* 1 *Bos. & Pull.* 316. *Whitaker's Law of Lien,* 45. *Whittington vs. The Farmers' Bank, &c.* 6 *Harr. & Johns.* 548. *Ross vs. Worsopp,* 1 *Bro. Parl. Ca.* 284. *Somerville vs. Somerville,* 5 *Ves.* 780. *Snook vs. Davidson,* 2 *Campb.* 218. *Pipon vs. Pipon,* 9 *Mod.* 431. *Holmes vs. Reemson,* 4 *Johns. Ch. Rep.* 478. *De Sobry vs. De Laistre,* 2 *Harr. & Johns.* 224.

3. On the *fourth* point, he cited *Liotard vs. Graves,* 3 *Caine's Rep.* 234. *Robinson vs. Bland,* 2 *Burr.* 1085. *Anonymous,* 1 *Johns. Rep.* 315. *Waddington vs. United Insurance Company,* 17 *Johns. Rep.* 23.

*R. Johnson,* on the same side. On the *first* bill of exceptions he contended, that the letters of *Kane* were not evidence, because he would not have been admitted himself to give evidence of the facts contained in those letters, he having an interest in the event of the suit. 1 *Phill. Evid.* 36, *(*and *note.)* *Harrison vs. Vallance,* 1 *Bingham,* 45, *(*8 *Serg. & Lowb.* 239.) *Jackson vs. Eaton,* 20 *Johns. Rep.* 478.

On the *second* bill of exceptions. If the facts in *Harding's* certificate were legally proved, they could not be evidence for the purpose for which the certificate was offered, because the amount of the disbursements were not pleaded by way of set-off, and no notice given of a set-off. 1 *Chitty's Plead.* 474.

*Meredith,* for *Douglass.* 1. On the *first* bill of exceptions. *Kane's* letters were not offered in evidence for the purpose of

proving the property of the vessel to be in him, but to show that the insurance was effected by the defendant for *Kane,* and as his agent. It does not thereby follow that *Kane* sets up ownership in the vessel. Any person who has a special property in a vessel may insure. A charterer of a ship may insure her. *Oliver vs. Green,* 3 *Mass. Rep.* 133. *Bartlett vs. Walter,* 13 *Mass. Rep.* 267. *Hobbs vs. Hannam,* 3 *Campb.* 93. *Phill. on Ins.* 51. But it has been urged that the letters are contradictory to the policy of insurance, and on that ground inadmissible in evidence. The party on whose account the insurance was effected, is not named. The defendant stands in the policy as agent; and you may go out of the policy in order to ascertain who is the assured. *Lawrence vs. Sebor,* 2 *Caine's Rep.* 203. *Davis vs. Boardman,* 12 *Mass. Rep.* 80. *Phill. Ins.* 63. *Church vs. Hubbart,* 2 *Cranch,* 196. 3 *Starkie's Evid.* 1021. *Mechanics Bank of Alexandria vs. Bank of Columbia,* 5 *Wheat.* 326. *Grant vs. Hill,* 4 *Taunt.* 380. The verdict in this case could not be used for or against *Kane,* in any suit by or against him. He was not, therefore, an interested witness. The letters are admissible evidence as a part of the *res gestæ.*

2. On the *second* bill of exceptions. The point involved in this exception, as to the admissibility of *Harding's* certificate in evidence, is abandoned by the defendant's counsel. The question was hastily decided by the court below without argument. The error of the court below is confessed, and the exception is waived.

3. On the *third* bill of exceptions. The court below has not stated that it is a general principle that the jury are to allow interest or not in all cases, but that in this particular case it was a fact for the jury. Here the defendant may be assimilated to a stakeholder; and the question, whether he ought to pay interest, must depend upon his conduct, as to what manner he has used the money, or thrown obstacles in the way of its recovery from him. This should be left to the jury to be ascertained by them. This is an action for money had and received; and the question of interest is for the jury, and depends upon the peculiar circumstances of the case. *Pease vs. Barber,* 3 *Caine's Rep.* 266. *Anonymous,* 1 *Johns. Rep.* 315.

4. On the *fourth* bill of exceptions, he contended, 1. That the evidence offered by the defendant in this exception, was admissible for the purpose for which it was offered. 2. That under the circumstances attending the effecting the insurance, it being designed for the benefit of **Kane**, and made by his authority, by the defendant as his agent, it did not enure to the benefit of the plaintiff's intestate, even though he was the true owner of the vessel; and that he was, therefore, not entitled to the proceeds of insurance in the hands of the defendant.

This bill of exceptions embraces two prayers made by the defendant—1st. Whether the bill of sale, being without consideration and fictitious, the plaintiff was entitled to recover. This prayer is hypothetical. The facts, that the transaction was collusive, are not to be doubted; and being so, no property in the vessel passed to *Newson*. The court refused to give the direction prayed, because the evidence was inadmissible. Was the evidence inadmissible? It was introduced as collateral—between different parties to the instrument. *Bend vs. Susquehanna Bridge & Bank Company*, 6 *Harr. & Johns.* 128. *Overseers of the Poor, &c. vs. Overseers of the Poor, &c.* 10 *Johns. Rep.* 229. 3 *Starkie's Evid.* 1051. The defendant is no party to the bill of sale. He is not a privy; but a mere stakeholder of the fund, and not in privity with either party. The evidence was not to vary the legal operation of the bill of sale, but to defeat its existence, as a fraud upon **Kane's** creditors. It is not to substitute the parol for the written evidence, but to avoid the bill of sale. 3 *Starkie's Evid.* 1015. An instrument of writing intended in fraud of others, may be avoided by such other persons. *Ib.* 1017. 2d. The *second* prayer reverses the hypothesis in the preceding prayer, by admitting the property in the vessel to be in *Newson*, and raises the question, whether, as he was no party to the contract of insurance, and it did not refer to him, but was made for the benefit of *Kane*, the plaintiff, as his representative, was entitled to recover? The court decided, that if the facts were true, the plaintiff was entitled to recover. Suppose this action was by *Newson* against the underwriters; if he could not recover from them, he cannot recover from the defendant. If the insurers paid the money to the defendant by mistake, they could recover it back from him. *Grant*

*vs. Hill,* 4 *Taunt.* 380. Could *Newson* recover from the underwriters? Two things must concur to enable him to recover from them—a contract, and an insurable interest. He might have contracted in person, or by his authorised agent. Here there was no contract between *Newson* and the underwriters, either in person or by agent. If by agent, where is the proof that the defendant was his agent? *Newson* was then dead, and he had no representative until after the money had been paid to the defendant. The plaintiff had no legal existence, either when the insurance was effected, or when the money was paid. There was no principal at the time of the insurance, or payment of the money. The proof is, that the contract of insurance was made for Kane. Could it, therefore, enure to the benefit of another person for whom it was not intended or made? No person can maintain an action on a contract to which he is not a party. 1 *Esp. Dig.* 202, *(105.) Jordan vs. Jordan, Cro. Eliz.* 369. *Crow vs. Rogers,* 1 *Stra.* 592. There is no difference in the application of this principle to the doctrine of insurance. The clause in the policy of insurance, "for whom it may concern," is capable of being construed to comprehend the insurable interest of Kane, to the exclusion of *Newson's.* Here there is proof that the insurance was effected by the defendant as the agent of Kane, and there is no proof that he insured for any other person. All actions on policies of insurance must aver an insurable interest in the plaintiff, and that the insurance was made for his benefit, and on his account. *Bell vs. Ansley* 16 *East,* 141, *(*and *note.*) *Cohen vs. Hannam,* 5 *Taunt.* 101. If the action had been by *Newson* against the underwriters, and the proof in this action was given in evidence, it would not support the averment which he ought to make in his declaration. *Phill. Ins.* 57, 58. *Bodwy vs. Union Insurance Company, Condey's Marsh.* 473, *(note.)* It must appear that the policy was effected for a particular person. He must be a party to the contract, or show that it was made for his benefit. *Lawrence vs. Sebor,* 2 *Caine's Rep.* 203. *Phill. Ins.* 60. A person having an insurable interest, if it is different from that insured, cannot recover on the policy. *Tappan vs. Massey,* 2 *Mass. Rep.* 365. *Conway vs. Gray,* 10 *East,* 536. *Phill. Ins.* 63. An insurance cannot enure for the bene-

fit of another for whose benefit it was not made. It has not been shown that the defendant insured for the benefit of Newson, or his representative. The representative of Newson being excluded by the proof in this bill of exceptions from having an insurable interest, he cannot recover. *Routh vs. Thompson,* 11 *East,* 428. *Routh vs. Thompson,* 13 *East,* 274. Where an insurance is effected by an agent, it must enure for the benefit of the person who constituted him the agent. *Seamans vs. Loring,* 1 *Mason's Rep.* 128. It has been said that the plaintiff has adopted the insurance, as made by the defendant, as his agent. The adoption, if it could be made, comes too late. It is after the money has been paid to the defendant. Here there could be no adoption, because the insurance was not intended for his benefit, or on his account.

*R. Johnson,* for Newson's Adm'r. in reply, as to the *first, second* and *third* bills of exceptions, and in answer to the *fourth* bill of exceptions.

1. On the *first* bill of exceptions. If the letters of Kane were out of the case, the plaintiff would have been entitled to recover to the extent of his demand. He proved an insurable interest, and that the defendant insured for the benefit of those concerned. The irresistible conclusion would be, therefore, that he acted as the agent of the plaintiff. But the letters are intended to prove that the defendant acted as the agent of Kane, and for his benefit; and not that Kane did not look to the interest of Newson's representative, and act as his agent. The letters were inadmissible. 1. Kane is to be assumed to act as agent of Newson. 2. Whether he did or not, but as a wrong-doer, the plaintiff has a right to adopt his acts. There was no evidence to show that Kane had an insurable interest, unless as agent of Newson. Kane was not the owner of the vessel; the ownership was proved to be in Newson. The insurance must be presumed to have been made for the benefit of the person having the insurable interest in the thing insured. What right had Kane to insure the property of another, unless as agent? If he did not insure as agent, then he acted as a tort feasor. If the insurance had been in the name of Kane, for the benefit of those whom it might concern, then the plain-

tiff, having the interest in the thing insured, could recover.
If the money was paid over to *Kane*, then it would be money
in his hands for the benefit of *Newson's* representative. If a
man takes the property of another, and sells it, the true owner
may waive the tort, and bring an action for the value received.
Here *Kane* took the vessel of the plaintiff, and sends her on a
voyage. She is lost, and *Kane* received the value of the pro-
perty. The plaintiff may elect to go for the value received,
instead of suing *Kane* as a tort feasor. If an agent represents
himself as owner of the thing insured, the policy will enure to
the benefit of the true owner. *Lanyon vs. Blanchard, 2
Campb.* 597. Here *Kane*, being the agent of *Newson*, em-
ployed the defendant to effect the insurance for him. The de-
fendant, knowing nothing of the true owner, effects the insu-
rance in his own name, and for all whom it might concern,
the insurance will enure to the benefit of the true owner. This
is presisely the case of *Lanyon vs. Blanchard, 2 Campb.*
597. It is immaterial whether the true owner authorised, or
knew of the insurance, he may adopt it at any time. If the
vessel arrived safe, he might disavow the act; and if she was
lost, he could claim the insurance. *Hagedorn vs. Oliverson,
2 Maule & Selw.* 485. The defendant cannot set up the inva-
lidity of the policy to prevent his paying the money over to
the true owner. *Tenant vs. Elliott,* 1 *Bos. & Pull.* 3. The
letters of *Kane* were not offered to show, that the insurance
was a valid one. If the policy was illegal, the party receiving
the money under it cannot avoid the policy. The letters were
offered to prove, that the fund belonged to *Kane*, and not to
the plaintiff. *Kane* was not a competent witness, nor are his
letters competent testimony for the defendant. If the defen-
dant succeeds in this action, he cannot retain the money, but
will be obliged to pay it over to *Kane*. His letters then go
to establish his interest in the fund. He is substantially the
defendant. *Harrison vs. Vallance,* 8 *Serg. & Lowb.* 239.
Whether the verdict could or could not be used in evidence
for or against *Kane*, yet the effect of a verdict for the defen-
dant would be to place the fund into the hands of *Kane*. If
the suit was by *Kane* against the underwriters, his letters
would be evidence as a part of the *res gestæ*. The effect of

his letters go to show that the fund does not belong to the plaintiff, but to him.

2. On the *second* bill of exceptions. Although this exception has been abandoned in this court by the defendant, the plaintiff has a right to the opinion of this court on it. The defendant may abandon the exception by refusing to urge any thing in support of the opinion given by the court below, and confess that that court erred in relation to it; yet as it is the plaintiff's exception, he is entitled to the opinion of this court upon it. The question, whether or not the certificate of *Harding* was evidence, has been answered by the defendant's counsel, who admits that it was not legal evidence. If it had been admissible, could the facts contained in it be used to prove the amount of disbursements made by the defendant before the receipt of the money on the insurance, and that he had paid them? On the state of the pleadings, the facts could not be used, for that purpose, as a set-off to the plaintiff's claim. By offering the set-off, the defendant admits, under the issue joined, that he made the *assumpsit* charged in the declaration, To use it as a discount or set-off, the defendant must have pleaded it, or have given notice. to the plaintiff of its being relied on at the trial.

3. On the *third* bill of exceptions. The question of interest is a question of law for the court, and not one of fact for the jury. *Pease vs. Barber*, 3 *Caine's Rep.* 266. *Liotard vs. Graves, Ib.* 234. *Waddington vs. United Insurance Company*, 17 *Johns. Rep.* 23. *Anonymous*, 1 *Johns. Rep.* 315.

4. On the *fourth* bill of exceptions. The bill of sale of the vessel from *Kane* to *Newson* has been proved by the subscribing witness. It was executed before the insurance was effected. By the *first* prayer the court was called upon to direct the jury that this bill of sale was fictitious, without any evidence to show that it was so, except *Kane's* letters. It was an abstract question, which the court were not bound to decide. But the proof is, that the bill of sale was a *bona fide* transaction. . This evidence came out on the cross examination of a witness by the defendant as to *Newson's* declarations. As there was no evidence to impeach the bill of sale, the direction prayed was properly refused. *Coale vs. Harrington, (ante* 147.*)*

If there had been no evidence stated in the bill of exceptions, then this court might presume that such evidence was offered so as to justify the prayer. *Barnes vs. Blackiston*, 2 *Harr. & Johns.* 376. The bill of sale was to be rendered void, if fraudulent, only at the instance of a creditor.

As to the *second* prayer—the proof is, that when Kane directed the insurance, he acted with a view to the benefit of *Newson's* representative. He took possession of the vessel, the owner being dead. He became thereby executor *de son tort*, and as such he sent the vessel to *Baltimore*, and caused her to be insured. He had an insurable interest; and the presumption is, that he had the insurance effected for the benefit of *Newson's* representative. *Hagedorn vs Oliverson*, 2 *Maule & Selw.* 485. There is an inconsistency in the opinions of the court below, as given in the *first* and in the *fourth* bills of exceptions. In the first the letters of Kane are admitted in evidence, and in the latter the court say the letters prove nothing.

*Mitchell*, on the same side. On the *second* bill of exceptions, as to the allowance for disbursements, he referred to *Snook vs. Davidson*, 2 *Campb.* 218. 2 *Liv. on Agency*, 80,83, 103. *Munford vs. Nicoll*, 20 *Johns. Rep.* 613. *Phill. Ins.* 520.

On the *fourth* bill of exceptions What is the plaintiff's right to recover founded on? It is upon the receipt of the money by the defendant, as his agent, under the policies of insurance. The right of the plaintiff does not rest alone on the bill of sale, but on the actual possession of the vessel as owner. There is a consideration expressed in the bill of sale which Kane acknowledged to be a valid one, and which he cannot now contradict. It is evidence of a *bona fide* consideration. There are also the declarations of *Newson*, as made evidence by the defendant, that he was the owner, and the recognition by *Kane* of that ownership. The *first* prayer, as stated in this bill of exceptions, is founded on the evidence contained in the depositions returned under the commission; and Kane's letters are no part of the evidence upon which the prayer was founded. *Riggin vs. Patapsco Insurance Company*, (*ante* 279.) But the letters do not impeach the bill of sale; and if they do, it is not competent for a party, who has executed an instrument

of writing, to come into court, and contest its validity. He is estopped from denying the title which passed under it. If the bill of sale was voluntary, it would make no difference as to *Kane*, unless he could show it was obtained by fraud or imposition; and there is no such proof here. No person, but he who is defrauded, can take advantage of it. *Jackson vs. Eaton*, 20 *Johns. Rep.* 478. There is no privity between the defendant and *Kane*, so as to justify the former in setting up a fraud by *Newson* on *Kane*. He was no creditor of *Kane*. But if he can, are *Kane's* letters evidence to prove the fraud? They are but the declarations of *Kane*, and *Kane* himself would not be a competent witness. Nor can *Kane's* death affect the case. If they were his dying declarations they would not be evidence, even if he were a competent witness. *Wilson vs. Boerm*, 15 *Johns. Rep.* 290. The declarations of a party in his own favour are never admitted in evidence. The letters, therefore, are incompetent to impeach the bill of sale. 2 *Phill. Evid.* 62, 219. *Roseboom vs. Billington*, 17 *Johns. Rep.* 187. *Fairlie vs. Hastings*, 10 *Ves.* 123. Whether or not the defendant was the agent of *Kane*, the court did not take into consideration. They said that no evidence was admissible to prove that the bill of sale was collusive, and intended to defraud *Kane's* creditors. What was it to the defendant whether the bill of sale was fraudulent or not? He was not a creditor, and none but creditors could prove the fraud, and take advantage of it. In the *second* prayer the defendant relies upon his own order for insurance, and that the insurances were effected in pursuance of that order. If the suit had been by *Kane* against the insurers, the defendant would have been a competent witness for *Kane*, and he might or might not use *Kane's* letters to show his agency. The defendant, instead of naming his principal in the policies, describes him; this is as sufficient as if he had named him. But when the person described, the owner of the vessel, comes forward, he is denied by the agent. Who was the person for whom the defendant made the insurance? It was the owner of the vessel; and who is the owner? Not *Kane*, but *Newson*. What is the legal import of the words used in the policies, *"for whom it may concern?"* It imports the person having an interest in the thing insured. They have a tech-

nical meaning. But the evidence offered denied the policies, and denied the name of the owner of the thing insured. It denies that the owner was *Newson*, but that it was *Kane*. The defendant, by the evidence, denies his principal, who was the true owner, and that true owner was *Newson*. The defendant may say that he was mistaken as to who was his principal; but he cannot shield himself under such a defence. Let him go into equity to reform the contract. At law it is binding upon him. What he intended to do, and what he did do, are different. He may have intended to insure for *Kane*, but he insured for the owner, and *Newson* was the owner. "For whom it may concern," means the person who has an interest in the thing insured. *Seamans vs. Loring*, 1 *Mason's Rep.* 128. *Lyman vs. United Insurance Company*, 17 *Johns. Rep.* 377. S. C. 2 *Johns. Ch. Rep.* 630. If the insurance was effected for *Kane*, it was a void policy; for he could not bring himself within the terms "for whom it may concern." He had no insurable interest. It would be a wagering policy, if it was not effected for the benefit of *Newson*, and would be void *per se.* If *Newson's* representative had no interest, then the plaintiff has no claim to the money. As to wagering policies, he referred to *Goram vs. Sweeting*, 2 *Saund.* 201, (and *notes.*) *Wolff vs. Horncastle*, 1 *Bos. & Pull.* 320. A contract of insurance, is a contract of indemnity. 1 *Phill. Ins.* 4, 26, 29. There is no evidence that *Kane* had an insurable interest; and if he had none, he could not insure on a valid policy. It would be a wagering policy, and therefore void. To give effect to the policies of insurance in this case, they must be construed as effected for the benefit of *Newson*. *Cousins vs. Nantes*, 3 *Taunt.* 521. They will protect the interest of *Newson* if there was no mistake; and there was no mistake, for the underwriters insured for the benefit of the true owner. If the defendant intended to insure for the benefit of *Kane*, that fact cannot be proved by parol evidence—the policies being for the benefit of those whom it might concern—the true owner. To reform the contract for mistake, it must appear to be the mistake of both parties; and here there is no evidence that the underwriters were mistaken as for whose benefit the insurances were made. They have not complained, but have acted under

their contracts; and have admitted that the policies covered an insurable interest, by paying the money on the loss of the vessel, to the defendant, as the agent of the person interested. Parol evidence is not admissible to prove a mistake. *Lyman vs. United Ins. Company,* 17 *Johns. Rep.* 377. S. C. 2 *Johns. Ch. Rep.* 630. *Gillespie vs. Moon,* 2 *Johns. Ch. Rep.* 585. *Graves vs. Boston Marine Insurance Company,* 2 *Cranch,* 419. *Phill. Ins.* 5, *(note.)* The defendant knew, from *Kane's* letters, that *Newson* was the owner of the vessel; and when he applied for insurance he did not state on whose account he wanted the insurance. *Kane* did not direct in whose name the vessel should be insured; and the insurers never saw *Kane's* letters. Who is to say that the letters of *Kane* were written at the time they purport to bear date? Where are the defendant's answers to those letters? The letters cannot be evidence that the insurances were effected by the defendant as the agent of *Kane.* 1 *Phill. Evid.* 426, 427. The defendant cannot prove his agency by letters. Where an agent sues, he is the contracting party on the instrument. He must aver the interest, and it must be proved. It is not necessary that an agent should know his principal, in order to act for him. It is for the principal to sanction the acts of his agent. *Routh vs. Thompson,* 13 *East,* 277, 282, 285. *Phill. Ins.* 519. Here the plaintiff has adopted the agency of the defendant, and in due and legal time. The acts of an agent may be ratified, as in this case, after he has received the money under an insurance effected for the benefit of his principal *Lanyon vs. Blanchard,* 2 *Campb.* 597. *Hagedorn vs. Oliverson,* 2 *Maule & Selw.* 490. *Stienback vs. Rhinelander,* 3 *Johns. Cas.* 269, per *Kent,* Ch. J. *Phill. Ins.* 59, 519, 520. *Snook vs. Davidson,* 2 *Campb.* 218.

*Wirt,* *(*Attorney General of *U. S.)* for *Douglass,* in reply, on the *fourth* bill of exceptions. 1. The objection is, that the defendant had no right to make the *first* prayer—there being no evidence, leading to the belief that the bill of sale was collusive, and that the court cannot be called on to give an opinion on an abstract question. If there was any proof going to show that the bill of sale was collusive, whether it was con-

clusive or not, the defendant had a right to call on the court for its opinion. There was evidence bearing on the point, on which the defendant relied in obtaining the opinion of the court, that the bill of sale was collusive. This evidence is the letters of *Kane*—the order for insurance—the policies of insurance—the proof of loss—the deposition of *Harding*, and the bill of lading and bill of sale referred to in *Harding's* deposition. All this evidence appears in the *fourth* bill of exceptions, upon which the prayer was founded. He then went into an examination of the testimony taken under the commission, and commented upon it. He insisted that the proof went to show that the vessel was not an *American* vessel. 2 *Vol. Laws of U. S.* 113. *Kane's* letters were offered to show that the defendant acted as his agent. They show in what light *Kane* presented himself as principal and owner of the vessel—that he assumed the character of owner, and as such constituted the defendant his agent to effect the insurance. There was sufficient evidence to justify the prayer being submitted to the court; and such a prayer may be offered for the court's opinion, without any evidence being stated. *Barnes vs. Blackiston*, 2 *Harr. & Johns.* 376. If the bill of sale was in fraud of the public laws, then any person may take advantage of it; and here was a fraud attempted on the public, and to evade the laws of the *United States* It was an attempt to obtain a registry of the vessel as *American*, contrary to the laws of the *United States.* In showing the bill of sale to be fraudulent, there is a distinction between a plaintiff and defendant. The defendant here is not on the same footing as *Kane* would be were he the defendant. How stands the defendant in this action? He is said to be a stakeholder. In September 1817 *Kane* died, and the loss did not occur until December 1817. The whole money was received by the defendant in March 1818. Did he receive the money as agent of *Kane?* A dead man can have no agent. Whose agent was he when he received the money? An administrator is the representative of the creditors of the deceased; so that when the money was received it belonged to *Kane's* creditors. It would be competent for *Kane's* creditors to show in equity that the bill of sale was made to defraud them; and if they could,

*Kane's* administrator, in like manner could, on behalf of the creditors. The defendant then held the fund as belonging to the administrator of *Kane,* representing the creditors. He could make the same defence, and contest the bill of sale on the same evidence, which *Kane's* administrator could. The defendant is then for this purpose to be connected with *Kane's* administrator and creditors, and not with *Kane* himself. The assignees of a bankrupt may avoid a fraudulent deed of the bankrupt. But it has been said that there is no proof that there were any creditors of *Kane.* The instruction of the court to the jury assumes that there were creditors; and that the defendant, in right of the creditors, could not give the proof in evidence. The bill of sale, besides, is not according to the directions of the act of congress, which points out how a transfer of an *American* vessel shall be made. 2 *Vol. L. U. S.* 113. and 4 *Vol. L. U. S.* 261.

2. As to the *second* prayer, as stated in this bill of exceptions. Admit that the defendant insured for whom it might concern, and that *Kane* had no interest. If he could not recover, neither could *Newson.* In such a policy by an agent, no person can recover, but by showing—1. That he has an interest; and 2. That the policy was made for his benefit. To prove a policy was made for his benefit he must do so *aliunde* the instrument. "For whom it may concern," are technical words, and mean the true owner concerned in the contract. It does not necessarily follow, that by proving an interest in the thing insured, that the policy was intended for him. He who claims must prove an interest, and also that the contract was intended for him, and that he has adopted it. *Seamans vs. Loring,* 1 *Mason's Rep.* 128, 136. 1 *Condy's Marsh.* 473, (note.) *Phill. Ins.* 57, 59, 60. *Stienback vs. Rhinelander,* 3 *Johns. Cas.* 269. *Lawrence vs. Sebor,* 2 *Caine's Rep.* 203. *Toppan vs. Atkinson,* 2 *Mass. Rep.* 365, 369. In his declaration he must aver that the insurance was effected for his benefit, and on his account. *Bell vs. Ansley,* 16 *East,* 141. *Cohen vs. Hannam,* 5 *Taunt.* 101. *Grant vs. Hill,* 4 *Taunt.* 380. Here the plaintiff must prove he had an interest in the vessel insured; that he authorised the defendant to act for him as his agent in effecting the insurance; that the defendant intended to act, and

did act for him as his agent; that the contract was intended for his benefit, and on his account, and that he adopted it in due and reasonable time. In fact, he must prove in this action what he would be bound to prove if he had brought an action against the underwriters. The doctrine of adoption and ratification go upon the ground that the contract was intended for the party, and that he adopted it; but he cannot adopt what was not intended for him, or his benefit. *Phill. Ins.* 61, 519. Here the defendant did not intend to act for *Newson.* 2 *Park,* 409, 410, 411. But it has been urged, that although the insurance was not intended for *Newson,* yet being made "for whom it may concern," he may come in and claim. This is not the law; he cannot come in unless the defendant *intended* to insure for him. *Hagedorn vs. Oliverson,* 2 *Maule & Selw.* 485. *Wolff vs. Horncastle,* 1 *Bos. & Pull.* 316. *Lucena vs. Crawford,* 3 *Bos. & Pull.* 75. *Routh vs. Thompson,* 13 *East,* 274, 284.

As to the right of adoption. Within what time must it be exercised? It need not be before the loss; it may be afterwards. But it cannot be after the insurance has been paid. *Phill. Ins.* 61. The act must be adopted while the transaction is *in fieri,* and not after the question has been settled. The party adopting must come in and encounter some of the expense; and cannot lie by, and appear after the question has been decided. The question tried is, whether it is his contract or not. The question of adoption did not arise in *Lanyon vs. Blanchard,* 2 *Campb,* 597; the question there was a question of lien. How can a man ratify an act done by another for the benefit of a third person? It requires the concurrence of two minds.

Here the policies are for the benefit of an unnamed person. It is a latent ambiguity, and may be explained by parol evidence; and *Kane's* letters are evidence for that purpose. 3 *Starkie's Evid.* 1002, 1021, 1023, 1024. *Mechanics Bank of Alexandria vs. Bank of Columbia,* 5 *Wheat.* 336. The plaintiff forces the inquiry, how the money came into the hands of the defendant? He must look to the policies of insurance, and to *Kane's* letters. They would be evidence against the underwriters, and they are evidence in this action. Put the letters out of the case, and what is the plaintiff's right to recover? He has no colour of title. Suppose he had sued the insurers, he must have proved

the policies were made for his benefit.    As to the prayers made by the defendant in the court below, this court are referred to *Routh vs. Thompson*, 11 *East*, 428.    But it has been said that *Kane* took the vessel as a wrong-doer—suppose he did, the plaintiff has no right to call upon the defendant to answer for' the acts of *Kane*.    He cannot give up the tort, and go for the money in the hands of the defendant.    This action being for money had and received cannot be sustained against the defen-dant.    He did not receive the money which had belonged to *Newson*.    It must have been *Newson's* money before the de-fendant received it, to enable the plaintiff to recover.    When the defendant received the money, *Newson* was dead.    In *Tenant vs. Elliott*, 1 *Bos. & Pull*. 3, the insurance was effect-ed by the plaintiff in the action; and it was his contract.    It is not, therefore, a parallel case with the present.    See also *Grant. vs. Hill*, 4 *Taunt*. 380.

BUCHANAN, Ch. J. delivered the opinion of the Court.    These are cross appeals from the judgment of the *Baltimore* county . court in a suit originally instituted by *Roswell L. · olt*, admini-strator of *Samuel Newson*, against *George Douglass*, to reco-ver the amount received by him on account of certain insur-ances effected on the ship *Mohawk*, and are presented to this court on *four* bills of exceptions taken at the trial; the *three first* on the part of the plaintiff below, and the *fourth* on the part of the defendant.

The two appeals having been discussed together before this court, they will be considered as if they were consolidated and formed but one case, and the parties treated as plaintiff and de-fendant.    And the admissibility in evidence of the letters from *Archibald Kane* to *Douglass*, which are introduced into the *fourth* bill of exceptions, constituting also the subject of the *first* exception, the *first* and the *fourth* exceptions will be examined in connexion.

The admissibility of these letters is resisted for different rea-sons; *first*, on the ground that *Kane*, if living, could not have been received as a witness to sustain the issue on the part of the defendant, by proving that the property in the ship was his, and that he directed the insurance for his own benefit; and that

his declarations, whether oral or in writing, are not competent for the purpose of establishing what he himself could not have been permitted to prove. The answer to which is, that however true, as a general position, it is not applicable to this case.

The letters of *Kane* were not offered or admitted in evidence as his mere declarations, or with a view of proving property in him at the time the insurances were effected, but for the purpose only, as is stated in the bill of exceptions, of showing by what authority *Douglass*, the defendant, procured the insurances to be made, and that he acted as the agent of *Kane* in these transactions, without affecting any question of property or right in *Kane* to the vessel insured; and it is very clear, that that which is not evidence for one purpose, may be for another, and when offered to prove that for which it is competent, must for that purpose be received.

*Kane* might, without any insurable interest in the vessel, have caused her to be insured, and have constituted the defendant his agent for that purpose; which fact of agency, unconnected with the question of property or insurable interest, the defendant was competent to prove by the best evidence the nature of the case would admit of; and that best evidence was the correspondence authorising and directing the insurance.

The agency of the defendant was a fact connected with the matter in controversy, but in no otherwise affecting the plaintiff than as the existence of that fact affected the nature of the transaction which gave birth to the suit, and not as concluding the rights of the plaintiff, or establishing the interest of *Kane*.

It is not understood as being denied, that the defendant might have been permitted to prove, that in effecting the insurances he acted as the agent of *Kane;* and how else should that agency have been proved than by the production of the letters themselves by which it was created?

If they were not letters authorising and directing insurance to be effected, but merely reciting or speaking of a pre-existing agency, and depending for their effect on the credit of *Kane,* the objection would have assumed a different character; but as it is, the first ground of objection cannot be sustained. And looking to the cases of insurance, reported in the books, it will be found to be the common, the every day practice, to admit

such testimony for the purpose for which it was offered and received in this case. And besides, that it is not opposed to any settled rule of evidence, the very nature of such transactions requires it; it is essential to the great operations of commerce between the different and remote sections of the world, which are, and must to a great extent, be carried on through an epistolary medium.

But it is supposed that the general terms of the policies of insurance of "*George Douglass,* for account of whom it may concern," &c. mean any and every body having an interest in the thing insured; and with that understanding of the policies, it is further contended, that these letters, (showing that the insurances were procured under authority derived from *Kane,)* were inadmissible, as tending to contradict the policies, which on the face of them, are for the benefit of all who may have any interest in the ship, by showing that they were effected for the benefit of *Kane* alone. If that were admitted to be the true meaning of the terms of the policy, it would by no means follow that the objection to the admissibility of the letters, arising merely out of that construction, could be sustained.

They were not used for the purpose of proving any interest or property in *Kane;* but if they had been, and were free from other objections, what was there to exclude evidence of property in him, and that he was the only person concerned in interest in the insurances? The policies being "for account of whom it might concern," evidence of who was in fact concerned, could not surely be contradictory to the policies. On what principle does the plaintiff seek to recover from the defendant the amount insured, other than that the ship belonged to *Samuel Newson,* his intestate, at the time of his death, and that the insurances were for the sole benefit of his representatives? And if evidence, that the insurances were obtained for the benefit of *Kane,* was inadmissible, as being contradictory to the terms of the policies, on what ground could proof be received that they were effected for the benefit of *Newson's* representatives?

But "whom it may concern" is a technical phrase, common to policies of insurance, and is understood to mean, not any and every body who may chance to have an interest in the

thing insured, but such only as are in the contemplation of the contract. Such a policy supposes an agency, and proceeding upon that ground, looks only to the principal in whose behalf, or on whose account, the agent moves in the transaction; and he, for whose benefit the insurance is procured, is the person in the contemplation of the contract—is he, whom it alone concerns.

The inquiry, therefore, in such cases, always is for whose benefit, on whose account, was the insurance obtained, and that not appearing upon the face of the instrument, is a proper subject of extrinsic evidence, which comes in aid of the policy, by pointing out the person to whom it is applicable, the party who is in fact concerned. And this is not confined to policies of insurance; but in the application of every instrument of writing, evidence *aliunde* is necessarily used to designate the proper subject matter to which it relates. The letters of *Kane,* therefore, were properly admitted in evidence, for the purpose of showing that the defendant effected the insurances as his agent, and under authority derived from him; which disposes of the *first* exception, leaving the question of *property* in the ship, and the intention of *Kane,* at the time of directing her to be insured, to the effect and operation of the other evidence in the cause.

It is well settled, that where a policy has not the general clause contained in this, or one of similar import, none can avail themselves of it but those who are named as the parties insured, or on whose account it is expressed to be made.

But it is equally clear, that a policy in the name of one, with the general clause "for whom it may concern," will cover and protect the interest of any person for whose benefit it was intended, and who authorised it to be effected. And if in the absence of any express order or authority from the owner, or any previous communication with him upon the subject, such policy is effected in his behalf; the intention at the time of the party effecting it to cover his particular interest, will so connect him with the policy as that his adoption of it afterwards will cause it to enure to his benefit. The subsequent adoption of a policy by a party interested, and for whose benefit it was in-

tended, being deemed equivalent to his prior order for insur ance. On this principle the cases of *Routh vs. Thomson*, 13 *East*, 274, and *Hagedorn vs. Oliverson*, 2 *Maule & Selw.* 485, were decided.

If then, *Newson* at the time of his death was the owner of the ship *Mohawk*, and *Kane*, when he gave the order for insurance to the defendant, did it with reference to the interest of *Newson's* representatives, and intended the insurance for their benefit, the policies, on being adopted by the plaintiff, would enure to his benefit, and *Kane*, if he had received the amount insured, would have been answerable over to him; and so with the present defendant into whose hands it has come. Or, if the money had not been paid by the underwriters, actions might have been maintained against them on the policies for the present plaintiff, on proper averments in the declaration of his interest, &c. And the circumstance that the policies were effected by the defendant, under the authority of *Kane*, makes no difference; acting as his sub-agent, they enure in the same manner that they would have done if they had been effected by *Kane* himself.

The *second* prayer, therefore, in the *fourth* exception, was properly rejected, the plaintiff's right to recover being assumed by the terms of that prayer to depend, not on the intention of *Kane* at the time of giving the order for insurance, but to rest entirely upon the understanding and intention of the defendant. And if it had been granted, the jury must have given a verdict for the defendant, on being satisfied that he effected the insurances as the agent, and for the benefit of *Kane*, even though they should have believed, from the evidence in the cause, that *Kane* himself had in contemplation the interest of *Newson's* representatives, and intended the insurance for their benefit.

But if *Kane* did not give the order for insurance with reference to the interest of *Newson's* representatives, but intended it for his own benefit, and not theirs, then the plaintiff is not entitled to recover. For no one can, by subsequent adoption, avail himself of such a policy, who was not at the time in the contemplation of the party procuring the insurance, and for whose benefit it was not intended, notwithstanding any interest he may have had in the

thing insured.   The policy not being effected with reference to his interest, his interest was not insured, and he of course not concerned in the transaction.

In the opinion of this court there is nothing in the *first* prayer contained in the *fourth* bill of exceptions.

If the bill of sale from *Kane* to *Newson*, under which the plaintiff claims, was in fact fictitious, and intended to defraud the creditors of *Kane*, it does not lie in the mouth of the defendant, standing in the place of *Kane's* representatives, to set up that fraud in bar of the plaintiff's recovery, however unclean the hands of *Newson* may have been.

As to the *second* exception, it is conceded by the counsel for the defendant, that there was error in permitting the certificate of *Harding* to be read to the jury.   It is not to be distinguished from any other mere declaration, in writing, of a third person, of the existence of a particular fact, which from its character can only be proved by the testimony of the witness himself on oath; and was clearly inadmissible, and most probably was admitted by inadvertence.

The question of interest, arising on the *third* exception, is one of frequent occurrence in the books, and has been found to be a subject not susceptible of the application of any fixed and general rule of law, the dealings between man and man being so various in their nature, that scarcely two cases are to be met with presenting the same aspect, but each depending upon its own peculiar circumstances.

There are indeed cases, not to speak of bonds, &c. in which interest is recoverable as of right.   Such as on a contract in writing to pay money on a day certain; as in the case of a bill of exchange or a promissory note, or on a contract for the payment of interest, or where the money claimed has actually been used.   But with such exceptions, it has long been the settled practice of the courts of this state, to refer the question of interest entirely to the jury, who may allow it or not in the shape of damages, according to the equity and justice appearing between the parties, on a consideration of all the circumstances of the particular case as disclosed at the trial.

The court below, therefore, did right in refusing to give the

direction prayed, and in submitting the question of interest to the jury.

But because the certificate of *Harding* was suffered to be read in evidence to the jury, as stated in the *second* bill of exceptions, the judgment of that court must be reversed

Before judgment was entered in either case, the appellant's attorney dismissed the appeal made by *Colt.*

COLT'S APPEAL DISMISSED.

On the appeal by *Douglass.*

JUDGMENT AFFIRMED.